UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

PLANVIEW TECHNOLOGIES, INC.,
F/K/A TASKTOP TECHNOLOGIES,
INCORPORATED,

                Plaintiff,

   -against-

TEACHERS INSURANCE AND
ANNUITY ASSOCIATION OF
AMERICA,

               Defendant.

------------------------------------------------------- X

Case No. 1:26-cv-02395 (GBD)

**DEFENDANT TEACHERS
INSURANCE AND ANNUITY
ASSOCIATION OF AMERICA'S
ANSWER AND COUNTERCLAIMS**

**JURY TRIAL DEMANDED**

Defendant Teachers Insurance and Annuity Association of America ("TIAA" or "Defendant"), by and through its attorneys, Seyfarth Shaw LLP, hereby submits its Answer to Plaintiff Planview Technologies, Inc. f/k/a Tasktop Technologies, Incorporated's ("Tasktop" or "Plaintiff") Complaint and Counterclaims as follows:

## NATURE OF THE ACTION

### COMPLAINT ¶1:

*This case arises out of TIAA's breach of the Master Customer Agreement and associated Order Forms (collectively, the "Agreement") it committed to with Tasktop. TIAA paid for access to Tasktop's value stream management software-as-a-service (SaaS) for 3,000 Users. But TIAA exceeded the number of authorized Users of Tasktop Products by **thousands** of individuals, in violation of TIAA's license. TIAA owes Plaintiff millions of dollars for the excess Users. TIAA admits to overages but disputes the number of unauthorized Users, based on its faulty, self-serving interpretation of the contractual definition of "Users," and refuses to pay Plaintiff the amounts it owes under the Agreement.*

### ANSWER:

TIAA admits that it paid for a license for 3,000 of its Users to use Tasktop's software.

TIAA denies the remaining allegations of Paragraph 1.

## PARTIES

**COMPLAINT ¶2:**

*Plaintiff Planview Technologies, Inc. f/k/a Tasktop Technologies, Incorporated is a British Columbia corporation with its principal Canadian place of business at 2360-555 West Hastings Street, Vancouver, British Columbia, V6B 4N6. Planview, Inc. acquired Tasktop in June 2022, including ownership of Tasktop's value stream management software and all of Tasktop's rights and obligations under the Agreement. Tasktop's name was changed to Planview Technologies, Inc. on January 1, 2024.*

**ANSWER:**

On information and belief, TIAA admits that Planview acquired Tasktop in 2022. TIAA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 2.

**COMPLAINT ¶3:**

*Defendant TIAA is a New York company with its headquarters and principal place of business located at 730 Third Avenue, New York, New York 10017.*

**ANSWER:**

Admitted.

## JURISDICTION, VENUE, AND CHOICE OF LAW

**COMPLAINT ¶4:**

*This Court has subject matter jurisdiction because the matter in controversy exceeds $75,000 and is between citizens of a State and a foreign state. 28 U.S.C. § 1332(a)(2).*

**ANSWER:**

Admitted.

**COMPLAINT ¶5:**

*Venue is proper because Defendant is a resident of this district and because a substantial part of the events giving rise to the claims occurred in this district. 28 U.S.C. §§ 1391(b)(1), (2).*

**ANSWER:**

Admitted.

2

**COMPLAINT ¶6:**

The Agreement provides that all disputes shall be governed by the laws of New York and that the parties consent to the exclusive jurisdiction of the state and federal courts located in New York, New York.

**ANSWER:**

Admitted.

<strong><u>FACTS</u></strong>

**COMPLAINT ¶7:**

On December 30, 2020, TIAA entered into the Master Customer Agreement with Tasktop, a Vancouver-based value stream management SaaS company.

**ANSWER:**

Admitted.

**COMPLAINT ¶8:**

In the Master Customer Agreement, Tasktop granted TIAA "a non-exclusive, non-transferrable, worldwide right and license to the Products, **for the specified number of paid Users (as set forth on the Order Form).**" Master Customer Agreement, § 1 (emphasis added). The "Products" include annual subscriptions to the Flow Framework package, which includes Tasktop Viz, and the Tasktop Integration Hub Ultimate Edition.

**ANSWER:**

TIAA responds to the allegations in Paragraph 8 by referring the Court to the Master Customer Agreement, which speaks for itself.

**COMPLAINT ¶9:**

The Master Customer Agreement defines a User as follows:

User means one of the following persons: Customer or Customer's Affiliates' employees or Authorized Subcontractors who (1) write, submit or otherwise enter in, or are referenced by, any data or information that is received (manually or in an automated fashion) by or from the Tasktop Product or server, or (2) access or use the Tasktop Product.

Id. at § 17. TIAA expressly agreed that it would not "allow access or permit use of the Products by any users other than Users." Id. at § 2.1(iii).

**ANSWER:**

TIAA responds to the allegations in Paragraph 9 by referring the Court to the Master

Customer Agreement, which speaks for itself.

**COMPLAINT ¶10:**

*The relevant Tasktop Product is Viz. Viz tracks delivery of a project from initial concept to completion across multiple software development tools, uncovering bottlenecks and creating a more efficient, predictable, and profitable process. In other words, Viz tracks the process of projects from a bird's-eye view perspective of the company by ingesting data from other third-party project management solutions. Like many of Plaintiff's customers, TIAA uses Atlassian Jira ("Jira"), ServiceNow and Micro Focus ALM. Out of these three third-party solutions, Viz predominantly ingested data from TIAA's usage of JIRA.*

**ANSWER:**

TIAA used Viz to display flow metrics to help its teams identify bottlenecks and

efficiencies within their agile portfolios. TIAA denies the remaining allegations of Paragraph 10.

**COMPLAINT ¶11:**

*TIAA uses JIRA—a project management software—to track information technology ("IT") tickets. When TIAA employees or subcontractors open a Jira ticket to address IT support or tasks, there are at least two individuals whose data or information is received by Viz: (1) a **reporter** who writes and submits the ticket regarding a task or issue; and (2) an **assignee** who receives the task from and is referenced by the reporter regarding the specific task or issue assigned. There may also be **watchers** who are also referenced in the ticket, receiving notifications about an issue and with the ability to add and view comments, as well as other types of Users that TIAA can create in custom fields. As such, in any given Jira ticket, there are at least two Viz Users.*

**ANSWER:**

TIAA understood that Viz accessed metadata from Jira and that the software was read only,

TIAA did not write to Viz. TIAA did not have access to the information in Viz that was accessible

to Tasktop and so denies the allegations set forth in Paragraph 11.

**COMPLAINT ¶12:**

*TIAA agreed that, upon receipt of a written request from Tasktop, it would "promptly furnish Tasktop with a written certification, signed by an authorized representative of [TIAA] providing the actual number of Users using the Products, and certifying that [TIAA] has not exceeded the number of paid Users and is in compliance with the terms of this Agreement." Id. at § 7.2. TIAA agreed to maintain records regarding use of the Products, and that Tasktop could*

*audit those records to "verify that the Products are used by [TIAA] in accordance with the terms of this Agreement and that [TIAA] has paid the applicable license fees…" Id. TIAA was required to "promptly pay to Tasktop any underpayments revealed by any such audit." Id.*

**ANSWER:**

TIAA responds to the allegations in Paragraph 12 by referring the Court to the Master Customer Agreement, which speaks for itself.

**COMPLAINT ¶13:**

*On December 23, 2020, TIAA purchased a two-year subscription for Tasktop's Viz through Order Form #TIAA-20201221-Q-02496-4 ("2020 Order Form"). TIAA's Viz subscription ran from December 29, 2020 through December 28, 2022 and provided access for up to 3,000 Viz Users. In the event that TIAA wished to purchase additional Users for Viz, it could do so in packages of 100 Users at the cost of $30,000 per package.*

**ANSWER:**

Admitted.

**COMPLAINT ¶14:**

*Just over a month later, on January 26, 2021, TIAA contracted for a three-year subscription to Tasktop's Hub Product, and added another year to its existing Viz subscription, through Order Form #TIAA-20210121-Q-02615-2 (the "2021 Order Form"). The three-year Hub subscription ran from February 1, 2021 through December 29, 2023, and following the one-year extension, the Viz subscription ran from December 29, 2020 through December 29, 2023. The 2021 Order Form provided access to Tasktop Viz and Tasktop Hub for 3,000 Users. TIAA could purchase additional Users of Viz in packages of 100 Users at the cost of $35,656.00 per package. Alternatively, during the term, TIAA could elect to purchase a subscription for unlimited Viz Users at a cost of $450,000 per year.*

**ANSWER:**

Denied. The provision allowing for TIAA to purchase unlimited Users provided the option "[f]or the term of this Order Form . . ." Moreover, while the 2021 Order Form contains a date of January 26, 2021, it was not executed by TIAA until February 24, 2021.

**COMPLAINT ¶15:**

*In or around November 2023, the parties began discussing renewal of the Hub and Viz subscriptions, which were set to expire at the end of December 2023. During those discussions, it became apparent that TIAA had been exceeding the authorized number of Users for the Viz subscriptions since the beginning.*

**ANSWER:**

TIAA admits that in or around November 2023 TIAA and Tasktop engaged in discussions concerning the renewal of TIAA's Hub and Viz subscriptions. TIAA denies the remaining allegations set forth in Paragraph 15.

**COMPLAINT ¶16:**

*Plaintiff provided TIAA with its initial assessment of the overages, which was based on the Jira data Plaintiff could access in Viz:*

> a. *At least 3,269 unauthorized Users during the December 30, 2020-December 29, 2021 term;*
>
> b. *At least 3,622 unauthorized Users during the December 30, 2021-December 29, 2022 term; and*
>
> c. *At least 4,983 unauthorized Users during the December 30, 2022-December 29, 2023 term.*

*This calculation of Users reflected the bare **minimum** of TIAA's underreporting. Due to Plaintiff's limited visibility into TIAA's systems, the foregoing calculation of unauthorized Users does not include Users from other third-party solutions also used by TIAA, such as TIAA's ServiceNow and Micro Focus ALM users.*

**ANSWER:**

TIAA admits that Tasktop provided TIAA with a purported assessment of alleged User overages of TIAA's Viz subscription. TIAA denies the remaining allegations set forth in Paragraph 16.

**COMPLAINT ¶17:**

*On November 27, 2023, TIAA informed Plaintiff that it would not be renewing Viz. The parties subsequently discussed potential renewal options, but on January 8, 2024, TIAA confirmed its termination of Viz.*

**ANSWER:**

TIAA admits the allegations set forth in Paragraph 17.

**COMPLAINT ¶18:**

*Plaintiff subsequently issued an invoice to TIAA for the excess Viz Users. TIAA did not pay the invoice.*

**ANSWER:**

TIAA admits that only after TIAA declined to renew its license, Tasktop issued, for the first time, an invoice in the amount of $4,233,793.33, contradicting its prior assertions that if TIAA did not renew the subscription, Tasktop would charge it $450,000 for each of the three years of the license period, pursuant to the terms of the Agreement. TIAA denies the remaining allegations set forth in Paragraph 18.

**COMPLAINT ¶19:**

*When Plaintiff invoked the reporting and audit procedures in Section 7.2 of the Master Customer Agreement and requested that TIAA provide its report of the number of Viz Users, TIAA provided spreadsheets showing its count of Users based on its usage of Jira. The spreadsheets showed that TIAA was under-reporting and only including certain **assignee** user-IDs on the Jira tickets as "Users." TIAA wholly failed to count and pay for thousands of **reporters** as well as **watchers** and other categories. This means that TIAA counted less than half the actual number of Users from Jira, which does not even take into consideration Users from TIAA's other third-party solutions.*

**ANSWER:**

TIAA admits that TIAA provided Tasktop with spreadsheets showing its count of Viz Users based on its usage of Jira and how Users would be counted under the Agreement. TIAA's methodology is consistent with the definition in the Agreement and with how Tasktop explained Users should be counted. TIAA denies the remaining allegations set forth in Paragraph 19.

**COMPLAINT ¶20:**

*In an April 15, 2024 letter, TIAA asserted that only part 2 of the definition of User applied to its use of Viz and claimed it only owes Plaintiff $71,312. But TIAA's position defies the Agreement's plain language and basic contract interpretation: A person who falls into either part 1 **or** part 2 is a User. The beginning of the definition of User ("means one of the following persons") does not permit TIAA to only count one part of the following two options. Rather, that language encompasses persons in either category in the calculation of User. This means all*

*assignees, reporters, watchers, and any other custom person fields created by TIAA are "Users," and TIAA owes Plaintiff for each and every person meeting the definition of User.*

**ANSWER:**

TIAA admits that it sent a letter to Tasktop dated April 15, 2024, stating TIAA's position that its calculations suggested a small true-up of its Users amounting to $71,312. TIAA's calculation was consistent with the definition in the Agreement and the methodology provided by Tasktop. TIAA denies the remaining allegations set forth in Paragraph 20.

## BREACH OF CONTRACT

**COMPLAINT ¶21:**

*The Agreement constitutes a valid and enforceable contract between Plaintiff and TIAA.*

**ANSWER:**

The allegations in Paragraph 21 constitute legal conclusions to which no response is required, and TIAA therefore denies them.

**COMPLAINT ¶22:**

*Plaintiff performed all of its obligations under the Agreement. All conditions precedent to the relief Plaintiff seeks have occurred or have been performed.*

**ANSWER:**

The allegations in Paragraph 22 contain legal conclusions to which no response is required, and TIAA therefore denies them. TIAA otherwise denies the allegations set forth in Paragraph 22.

**COMPLAINT ¶23:**

*TIAA exceeded the number of authorized Users by thousands, yet TIAA refuses to pay Plaintiff the amounts it owes.*

**ANSWER:**

TIAA denies the allegations set forth in Paragraph 23.

**COMPLAINT ¶24:**

*TIAA is liable to Plaintiff for actual damages, totaling more than $4,233,793.33, plus interest.*

**ANSWER:**

TIAA denies the allegations set forth in Paragraph 24.

## PRAYER FOR RELIEF

**COMPLAINT ¶25:**

Plaintiff respectfully requests that the Court enter judgment:

a.      awarding Plaintiff damages in the amount of $4,233,793.44;

b.      awarding Plaintiff further damages in an amount to be determined at trial;

c.      awarding Plaintiff prejudgment and post-judgment interest; and

d.      awarding Plaintiff such other and further relief as the Court deems just and proper.

**ANSWER:**

The foregoing paragraph constitutes Tasktop's prayer for relief, to which no response is required. To the extent a response is required, TIAA denies any allegations contained therein and specifically denies that Tasktop is entitled to any relief whatsoever.

## TIAA'S AFFIRMATIVE AND ADDITIONAL DEFENSES

### TIAA'S FIRST DEFENSE

Tasktop's Complaint fails, in whole or in part, to state a claim upon which relief can be granted or for which the damages sought can be awarded.

### TIAA'S SECOND DEFENSE

Tasktop's claim is barred due to Tasktop's breach of the Agreement. Specifically, Tasktop breached the Agreement by failing to: (a) conduct a review of TIAA's usage of Viz no later than sixty (60) days prior to expiry of each annual anniversary of TIAA's Viz "Subscription Start Date" set forth in the 2020 Order Form and 2021 Order Form; (b) timely inform TIAA of any claimed

9

User overages pursuant to the Agreement; and (c) administer TIAA's Viz subscription in accordance with the agreed definition of User set forth in the Agreement.

## TIAA'S THIRD DEFENSE

Tasktop's claim is barred, in whole or in part, by the doctrine of unclean hands and/or bad faith, including but not limited to Tasktop refusing to provide coherent information about the number of Users it claimed TIAA had; failing to flag for TIAA its alleged overage of Users for three years when Tasktop was materially involved in TIAA's use of the product during that time; and invoicing TIAA $4,233,793.33 million when the Agreement calls for a maximum amount of $450,000 per year and Tasktop itself outlined this in its communications to TIAA.

## TIAA'S FOURTH DEFENSE

Tasktop's claim is barred, in whole or in part, by the doctrine of estoppel, quasi-estoppel, and/or equitable estoppel based on Tasktop's own conduct, including its own representations as to how Users would be counted under the Agreement, TIAA's justifiable reliance on those representations, and Tasktop's silence for years concerning any User overages by TIAA. In reliance on Tasktop's representations and conduct, TIAA did not purchase additional User licenses; structured its operations and budgeting based on the 3,000-User threshold; and continued its use of Viz under the assumption of compliance.

## TIAA'S FIFTH DEFENSE

Tasktop's claim is barred, in whole or in part, by the course of dealing and/or course of performance between the parties. At the outset of the parties' relationship, Tasktop made representations to TIAA as to how Users would be counted under the Agreement, and both parties entered into the Agreement and engaged in a three-year business relationship based on an agreed definition of User. Tasktop also assigned "Flow Advisors" dedicated to implementing and servicing Viz on TIAA's platform who worked to onboard Users onto Viz. Yet, during the three-

year period of TIAA's Viz subscription, and in over 150 individual phone calls between TIAA and the Flow Advisors, Tasktop never once raised or discussed with TIAA any existing or potential User overages, despite the Agreement requiring Tasktop to conduct an annual review of TIAA's Viz usage no later than sixty (60) days prior to expiry of each annual anniversary.

## TIAA'S SIXTH DEFENSE

Tasktop's claim is barred, in whole or in part, by the doctrine of *contra proferentem* as Tasktop drafted the Agreement.

## TIAA'S SEVENTH DEFENSE

Tasktop's claim is barred, in whole or in part, by the doctrine of laches and/or waiver. Tasktop had actual or constructive knowledge of TIAA's usage of Viz throughout the subscription term. Tasktop had repeated opportunities and contractual obligations to assert any claim of over-usage. Tasktop nonetheless failed to conduct the required reviews and failed to provide any notice of overages for multiple years. Tasktop's knowing failure to assert its rights constitutes waiver of any claim for additional User fees.

## TIAA'S EIGHTH DEFENSE

Tasktop's claim is barred, in whole or in part, by the doctrines of mutual mistake and/or unilateral mistake. Should the Court determine that there has been a mutual and/or unilateral mistake, TIAA requests reformation of the Agreement to align the definition of User with that represented to TIAA by Tasktop at the time of contracting.

## TIAA'S NINTH DEFENSE

Tasktop's claim is barred, in whole or in part, by negligent misrepresentation. To establish a claim for negligent representation in New York, a plaintiff is required "to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on

11

the information." *J.A.O. Acquisition Corp. v. Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007). In this case, Tasktop drafted the terms of the Agreement, including the definition of User in the Master Customer Agreement, possessed exclusive insight into TIAA's Viz usage metrics, and had the exclusive ability to apply its definition of User to the usage metrics in determining the number of TIAA Viz Users. Given this disparity in the parties' relative positions, Tasktop had a duty to impart accurate information concerning the definition of User and to act transparently in its calculation of TIAA's Viz User count. Tasktop, however, provided TIAA with a definition of User different from that which Tasktop used to calculate the number of Users of its Viz platform. Further, TIAA reasonably relied on Tasktop's definition of User, given that Tasktop drafted the Agreement and Viz is Tasktop's proprietary software.

**TIAA'S TENTH DEFENSE**

Tasktop's claim is barred, in whole or in part, by fraud and/or fraudulent inducement. Under New York law, the elements of a claim for fraud are (1) a material misrepresentation of fact, (2) knowledge of its falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages. *See, e.g., Rapaport v. Strategic Fin. Sols., LLC*, 190 A.D.3d 657, 657 (1st Dep't 2021); *Sneider v. Great South Bay Surgical Assocs. & Vascular Lab, LLP*, 235 A.D.3d 685, 687 (2d Dep't 2025); *Frank Crystal & Co., Inc. v. Dillmann*, 84 A.D.3d 704, 704 (1st Dep't 2011) (reciting same standard for claim of "fraudulent inducement of contract"). Here, Tasktop misrepresented the definition of User to TIAA at the outset of the parties' Agreement in 2020 knowing that the definition provided to TIAA was different from that which Tasktop used to calculate the number of Users of its Viz platform, and with the intent that TIAA would rely upon the provided definition as inducement to enter into the Agreement. Further, TIAA justifiably relied on the definition of User provided by Tasktop, and has been harmed by its reliance thereon in light

12

of Tasktop's later calculation of purported Viz User overages by TIAA using an alternative definition that only Tasktop had knowledge of. *See also infra* at ¶¶7-11, 22-27.

## TIAA'S ELEVENTH DEFENSE

To the extent the Court determines that the New York Uniform Commercial Code (NY UCC) applies with respect to the Agreement, Tasktop's claim is barred, in whole or in part, by the defenses and/or equitable principles available thereunder including, but not limited to: course of performance, course of dealing, and trade usage; waiver and modification; fraud; and the duty of good faith inherent in all transactions governed by the NY UCC.

## TIAA'S TWELFTH DEFENSE

TIAA reserves the right to amend its Answer to raise additional affirmative defenses or to pursue any available counterclaim against Tasktop as those claims or affirmative defenses become known during the litigation.

**WHEREFORE**, TIAA prays that the Court enter a judgment:

1.     dismissing the Complaint with prejudice;

2.     granting TIAA its costs, including attorney's fees, incurred in this action; and

3.     granting such other and further relief as the Court may deem just and proper.

13

## TIAA'S COUNTERCLAIMS AGAINST TASKTOP

Defendant/Counter-Plaintiff Teachers Insurance and Annuity Association of America ("TIAA"), by its undersigned counsel and pursuant to Rule 13 of the Federal Rules of Civil Procedure, states the following for its Counterclaims against Plaintiff/Counter-Defendant Planview Technologies, Inc. f/k/a Tasktop Technologies, Incorporated ("Tasktop"):

## PARTIES, JURISDICTION AND VENUE

1. Pursuant to the allegations in the Complaint, Planview Technologies, Inc. f/k/a Tasktop Technologies, Incorporated is a British Columbia corporation with its principal Canadian place of business at 2360-555 West Hastings Street, Vancouver, British Columbia, V6B 4N6. Planview, Inc. acquired Tasktop in June 2022, including ownership of Tasktop's value stream management software and all of Tasktop's rights and obligations under the Agreement. Tasktop's name was changed to Planview Technologies, Inc. on January 1, 2024.

2. TIAA is a New York company with its headquarters and principal place of business located at 730 Third Avenue, New York, New York 10017.

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds $75,000 and is between citizens of a State and a foreign state.

4. Venue is proper in the Southern District of New York because under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to TIAA's Counterclaims occurred in this district.

5. Moreover, by suing in this district, Tasktop has consented to jurisdiction in the Southern District of New York.

14

**FACTS**

6.      On August 8, 2019, TIAA and Tasktop entered into a certain Tasktop Evaluation Program Agreement (the "Evaluation Agreement") whereby TIAA gained early access to evaluate Tasktop's Viz service with the goal of enhancing efficiency of its own internal work flows. The Evaluation Agreement was extended again on February 5, 2020. Due to satisfaction with Viz's capabilities during the evaluation period, TIAA engaged in business negotiations with Tasktop over the course of 2020 in order to secure more permanent access to Viz through a formal subscription. During this time, Tasktop's primary point of contact was Emily Kelsey, Tasktop's Regional Sales Manager charged with establishing the relationship with TIAA.

7.      In the course of the parties' negotiations for a formal subscription agreement, Tasktop informed TIAA that Users would be counted as those persons working in each of TIAA's Jira project "containers," which is a collection of issues representing development work for a specific product or service. This explanation conforms to the definition of User, and it identified for TIAA how it could track and count its own Users, which is important in light of the increased costs for increased usage.

8.      Specifically, in the discussions leading up to TIAA's execution of the Agreement, Ms. Kelsey made a presentation to TIAA that included an illustration on how to count Users.

9.      She memorialized that presentation in an email to TIAA on August 19, 2020, entitled "Tasktop ROI and Business Case," attaching an annotated excel spreadsheet confirming this understanding. The excel sheet contained a note citing to the definition of User as follows:

> User means one of the following persons: Customer or Customer's Affiliates' employees or Authorized Subcontractors who (1) write, submit or otherwise enter in, or are referenced by, any data or information that is received (manually or in an automated fashion) by or from the Tasktop Product or server, or (2) access or use the Tasktop Product.

10.     The definition of User provided by Ms. Kelsey in her August 19, 2020 communication is identical to the definition of User in the Agreement. *See* Agreement. at § 17.

11.     Ms. Kelsey then explained how TIAA would calculate the number of Viz Users applying this definition:

are not

| | 70% | FTEs licensed = Number of "connected users" licensed for Tasktop |
| | 1500 | |
| | 3% | Legal definition of a Tasktop user : |
| | $10,000 | "Customer or Customer's Affiliates' employees or Authorized Subcontractors who (1) write, submit or otherwise enter in, or are referenced by, any data or information that is received (manually or in an automated fashion) by or from the Tasktop Product or server, or (2) access or use the Tasktop Product." |

YEAR 3

If you want an estimate of current usage or a way to project users for scaling, you can:

| | 30mo | 36mo |
| Current Usage - | 52% | 60% |
| Count the number of JIRA projects (aka product areas, teams) you have connected in Viz. | 26% | 30% |
| Estimate 10-12 people per team | | |
| FTEs licensed = 10-12 x # of projects | | |
| OR | $98 | $101 |
| simply count the number of people in the JIRA projects you have or will have connected to Viz | | |
| | 2080 | 2080 |
| By the definition of User, Tasktop counts all users across the value stream. Tasktop Viz captures a | 1,456 | 1,456 |
| comprehensive view of the work flowing in the given value stream from inception to production. While a | $204,558 | $210,695 |
| subset of people will be reviewing the metrics in Viz, the experiments and improvements will impact all | | |
| of the users of the given value stream. | | |
| | 1500 | 1500 |
| Current usage example | 153,418,871 | $158,021,437 |
| Viz shows it is detecting changes 64 JIRA projects | | |
| Can you count the number of people assigned to those projects from JIRA admin? | $33,484,006 | $33,484,006 |
| If no, or simply estimating : 64 x 10-12 people = # FTEs or Tasktop users | | |
| | $5,000 | $5,000 |
| | $25,570 | $26,337 |
| | $437,621 | $437,621 |
| | $204,558 | $210,695 |

| | $628,100 | $634,418 | $646,793 | $653,301 | $672,750 | $679,653 |

12.     This note counseled TIAA to either (1) "count the number of JIRA projects…you have connected to Viz," estimate the number of people per team—suggested at 10-12 persons per team—and then multiply the number of Jira projects by the estimated number of people per team, *or* (2) "simply count the number of people in the JIRA projects you have or will have connected to Viz."

13.     Carmen DeArdo, a Principal Flow Advisor with Tasktop, also received the email with this explanation.

16

14. Neither Ms. Kelsey nor Ms. DeArdo clarified this explanation or withdrew it in the following three years of the business relationship with TIAA.

15. In reliance on this mutual understanding between the parties regarding how User would be defined and applied to TIAA's use of Viz, TIAA entered into the Agreement. *See* Agreement. at § 17.

16. On December 30, 2020, TIAA executed the Master Customer Agreement and purchased a two-year subscription of Viz via an order form (the "2020 Order Form"), which subscription ran from December 29, 2020 through December 28, 2022. This subscription provided access for up to 3,000 TIAA Viz Users. The 2020 Order Form provided that prior to expiry of each annual anniversary of the Subscription Start Date of the Order Form, the parties would review usage, and "should usage increase from the three thousand (3000) Users purchased herein, Customer shall enter into a new Order Form for Additional Users to cover such increased usage."

17. On February 24, 2021, TIAA added another year to its existing Viz subscription through another order form (the "2021 Order Form"), extending its Viz subscription through December 29, 2023. Like the 2020 Order Form, the 2021 Order Form provided that prior to expiry of each annual anniversary of the Subscription Start Date of the Order Form, the parties would review usage, and "should usage increase from the three thousand (3000) Users purchased herein, Customer shall enter into a new Order Form for Additional Users to cover such increased usage." The Order Form further provided that TIAA could purchase a subscription for an unlimited number of Viz Users at a cost of $450,000 per year for the term of the Order Form.

18. Specifically, the 2020 and 2021 Order Forms required the parties to "review usage" of Viz by TIAA no later than "[s]ixty (60) days prior to expiry of each annual anniversary of the

17

Subscription Start Date of th[e] Order Form," which was set at December 29, 2020 for the 2020 Order Form and December 30, 2022 for the 2021 Order Form.

19. The Master Customer Agreement, together with the 2020 Order Form and 2021 Order Form, collectively constitute the "Agreement" between TIAA and Tasktop. TIAA paid Tasktop $2.7 million for the three years' worth of subscriptions embodied by the Agreement.

20. Upon commencement of TIAA's Viz subscription in December 2020, Tasktop assigned "Flow Advisors" dedicated to implementing and servicing Viz on TIAA's platform, and worked to onboard Users onto Viz. During the three-year period of TIAA's Viz subscription, and in over 150 individual phone calls between TIAA and the Flow Advisors, Tasktop never identified, notified, or discussed with TIAA any existing or potential User overages.

21. In July 2022, Planview, a private equity owned enterprise software company, purchased Tasktop, with a clear intent of increasing revenue.

22. Toward the end of the term of the Agreement, for business reasons, TIAA concluded that it no longer desired to use Tasktop's Viz platform. Accordingly, on November 27, 2023, and as its subscription was drawing to a close, TIAA provided Tasktop with notice that it would not be renewing its Viz subscription for a new term.

23. On December 5, 2023, Tasktop responded by alleging that TIAA had engaged in a systematic undercounting of Viz Users since the beginning of the term of the Agreement. Instead of the 3,000 Users that TIAA had contracted for, Tasktop now alleged that TIAA had 6,269 unique Users in 2021, 6,622 unique Users in 2022, and 7,983 unique Users in 2023.

24. The obligation for the parties to review TIAA's Viz usage "[s]ixty (60) days prior to expiry of each annual anniversary of the Subscription Start Date" was designed to provide the parties an opportunity to resolve any concerns about counting Users, to compensate Tasktop for

18

overages, to allow the licensee to take advantage of the pricing for any additional Users, and to provide the licensee an opportunity to course-correct if, in fact, its license usage was greater than planned.

25.     TIAA did not have reason to believe its usage of Viz exceeded the 3,000 licenses it paid for. Tasktop, on the other hand, apparently did believe that to be the case, and its failure to review usage with TIAA consistent with the annual review requirement constitutes a material breach of the Agreement.

26.     Tasktop's calculation of Users was, and remains, opaque to TIAA, so Tasktop's compliance with this provision would have allowed the parties to address their disagreement in counting methodology early in the Agreement. It also would have allowed TIAA to adjust its Users to the extent it may have agreed (or agreed to disagree) with Tasktop at the end of the first year.

27.     In response to Tasktop's claim that TIAA had more than double the number of licensed Users in each of the three years of the Agreement, TIAA asked Tasktop to provide data regarding Tasktop's calculation of User overages. While Tasktop provided spreadsheets on December 12 and December 14, 2023 purporting to show its count of TIAA Viz Users, Tasktop admitted that the information constituted a "raw data dump…that likely would not be productive for you." Later on, when pressed by TIAA for clarity regarding its User overage calculations, Tasktop stated that it was continuing to work on "a 'reverse engineering' strategy to provide a clear count of Users," confirming the opacity of its counting methodology.

28.     In an email sent on December 15, 2023, Tasktop stated that if TIAA chose not to renew and terminated the Agreement, it would be obligated to pay the maximum contractual liability of $1.35 million (i.e., the unlimited User charge of $450,000 per year set forth in the 2021 Order Form, multiplied by three years).

29.    Specifically, Tasktop stated that if "TIAA chooses to keep the notice of termination in place . . . [p]er the agreements, Planview will invoice TIAA for past overage usage." This overage fee, according to Tasktop, "will be $450K per year, totaling $1.35M from 2021 through 2023."

30.    On December 21, 2023, Tasktop sent another email in which it reiterated that should TIAA choose not to renew the subscription, then Tasktop would "invoice TIAA for $1.35M for the prior overages."

31.    Although the Agreement expired on December 29, 2023, renewal negotiations between TIAA and Tasktop continued into January 2024.

32.    On January 8, 2024, TIAA confirmed that it would not renew its Viz subscription. Tasktop responded on January 11, 2024, stating that Tasktop would "issue an invoice for the $4.2M in overage fees incurred in the last 3 years." On January 19, 2024, Tasktop issued an invoice to TIAA demanding payment of $4,233,739.44 for TIAA's purported User overages.

33.    TIAA conducted its own analysis to determine the number of Viz Users for its Jira projects. TIAA's analysis, which employed the same definition of User that Tasktop provided at the outset of the parties' relationship, determined that there were only 1,396 unique Viz Users in 2021, 1,929 unique Users in 2022, and 3,124 unique Users in 2023.

34.    Accordingly, in letters dated March 11, 2024 and March 21, 2024, TIAA reiterated that it disputed the invoice, requested verification showing how Tasktop arrived at the usage numbers, and directly addressed the inconsistency between Tasktop's original $1.35 million User overage fee and the $4,233,739.44 sum that Tasktop was now demanding.

### TIAA'S FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

35.    TIAA re-alleges paragraphs 1 through 34 as if fully set forth herein.

20

36. TIAA and Tasktop executed a valid contract: the Agreement.

37. The Agreement was composed of (1) the 2020 Order Form, executed on December 30, 2020, (2) the Master Customer Agreement, executed on December 30, 2020, and (3) the 2021 Order Form, executed on February 26, 2021.

38. The Agreement was negotiated at arms' length.

39. TIAA performed its obligation under the Agreement by making timely payment for its three-year subscription of Tasktop's Viz platform, including payment of approximately $2.7 million.

40. Tasktop, however, breached the Agreement by failing to (a) apply the definition of User consistent with the terms of the Agreement and as explained by Tasktop, and (b) timely inform TIAA of any claimed User overages.

41. Tasktop's application of the definition of User is wholly inconsistent with the definition and the explanation Tasktop provided to TIAA.

42. Tasktop did not seek to conduct any review of TIAA's Viz usage or bring to TIAA's attention notice of any purported Viz User overages until the end of the Agreement, and only after TIAA indicated it would not renew.

43. Tasktop's actions constitute material breaches of the Agreement.

44. Tasktop's breaches misapply the definition of User.

45. Tasktop's breaches deprived TIAA of the ability to address the disputed counting methodology early in the parties' Agreement, sandbagging TIAA with the intent of creating maximal pressure on TIAA to renew.

46.    As a direct and proximate result of Tasktop's breaches of the Agreement, TIAA has suffered, and continues to suffer, costs and damages in an amount to be determined at trial, including nominal damages.

47.    TIAA therefore requests that the Court grant TIAA any and all damages and other relief available at law or in equity.

**TIAA'S SECOND CLAIM FOR RELIEF**
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

48.    TIAA re-alleges paragraphs 1 through 47 as if fully set forth herein.

49.    As set forth herein, Tasktop has acted in bad faith in connection with its contractual obligations under the Agreement.

50.    Tasktop has done so by, among other things, failing to notify TIAA of any alleged User overages regarding its Viz platform until TIAA communicated its desire not to renew its Viz subscription despite having access to TIAA's usage data; sandbagging TIAA by failing to be transparent and timely reporting TIAA's purported User overages until TIAA declined renewal; admitting its counting methodology was opaque and not sharable with its licensee; and claiming entitlement to inflated payment well in excess of what the Agreement requires (as evidenced by its own prior admissions).

51.    Tasktop's conduct was designed to create undue pressure on TIAA to renew, and when TIAA declined to renew, to be punitive and extract an improper financial windfall and deprive TIAA of the benefit of its bargain.

52.    Tasktop's conduct constitutes a breach of the implied covenant of good faith and fair dealing inherent in the Agreement and a violation of Tasktop's obligation to exercise its contractual rights in good faith so as not to deprive TIAA of the benefits of the Agreement's terms.

22

53.    In the event that TIAA is found liable for User overages in each year of the Agreement's term, Tasktop's breaches of the implied covenant of good faith and fair dealing will have harmed TIAA in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, TIAA prays for judgment as follows:

1.    For a judgment in favor of TIAA on its claim against Tasktop;

2.    For an award of damages resulting from Tasktop's breach of the Agreement, in an amount to be determined at trial;

3.    For an award of damages resulting from Tasktop's breach of the implied covenant of good faith and fair dealing, in an amount to be determined at trial;

4.    For reasonable attorney's fees; and

5.    For such other and further relief that the Court deems just and proper.

### DEMAND FOR JURY TRIAL

TIAA hereby demands trial by jury with respect to all claims.

Dated: New York, New York
     May 22, 2026

Respectfully submitted,

SEYFARTH SHAW LLP


By:  */s/ Torrey K. Young*

    Torrey K. Young (SDNY No. 5768239)
    tkyoung@seyfarth.com
    620 Eighth Avenue
    New York, New York 10018
    Telephone: (212) 218-5500
    Facsimile:  (212) 218-5526

    Rebecca Woods (*admitted pro hac vice*)
    Connor M. Hutchins (SDNY No.
      6016430)
    1075 Peachtree Street, N.E., Suite 2500
    Atlanta, Georgia 30309
    Telephone: (404) 885-1500
    Facsimile:  (404) 892-7056

    *Attorneys for Defendant/Counter-Plaintiff*
    *Teachers Insurance and Annuity Association of*
    *America*

## CERTIFICATE OF SERVICE

I do hereby certify that I have caused a true and correct copy of the foregoing DEFENDANT TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA ANSWER AND COUNTERCLAIMS to be served upon all counsel of record, as listed below, via the Court's CM/ECF system, on this 22nd day of May, 2026.

Steven G. Mintz
Scott A. Klein
MINTZ & GOLD LLP
600 Third Avenue, 25th Floor
New York, NY 10016
mintz@mintzandgold.com
klein@mintzandgold.com

Karen C. Burgess
Katie Dolan-Galaviz
Burgess Law PC
Austin, TX 78701-1825
kburgess@burgesslawpc.com
kgalaviz@burgesslawpc.com

*Attorneys for Plaintiff*

/s/ Torrey K. Young
Torrey K. Young